MICHAEL H. PORRAZZO (SBN 121260)
THE PORRAZZO LAW FIRM
28202 Cabot Road, Suite 300
Laguna Niguel, CA 92677
Telephone: (949) 348-7778
mhporrazzo@porrazzolaw.com

Attorney for Plaintiff
Lance Turner

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LANCE TURNER, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> JOSEPH SUAREZ, a/k/a/ JOSE GILBERTO SUAREZ, ELIZABETH SUAREZ, JOHNATHAN SUAREZ, TIFFANY SUAREZ, and DOES 1 through 50, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DAMAGES:** <br> 1. **BREACH OF IMPLIED-IN-FACT CONTRACT** <br> 2. **FRAUD (INTENTIONAL MISREPRESENTATION AND CONCEALMENT)** <br> 3. **CIVIL RACKATEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(c) & 1962(d)** <br> 4. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** <br> 5. **UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE §§ 17200 et seq. 285** <br> 6. **CONVERSION (COMMON-LAW) AND EMBEZZELMENT (CAL. PEN. CODE § 503)** <br> 7. **CONSTRUCTIVE TRUST AND ACCOUNTING** <br> 8. **COMMON COUNTS - MONEY HAD AND RECEIVED / UNJUST ENRICHMENT** |

COMES NOW, Plaintiff, LANCE TURNER, alleging as follows:

## JURISDICTION AND VENUE

1. This Court has (a) federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C.

Complaint for Damages
-1-

1  §§ 1962(c)–(d)), and (b) diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different States. Plaintiff Lance Turner is a citizen of Arizona. Defendant Joseph Suarez a/k/a/ Jose Gilberto Suarez, is a citizen of New Jersey; Defendant Elizabeth Suarez is a citizen of New Jersey; Defendant Johnathan Suarez is a citizen of Florida; and Defendant Tiffany Suarez is a citizen of California. The citizenships of Doe defendants are presently unknown and will be alleged when ascertained.

2.  Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2) because Defendant Tiffany Suarez resides in this District and a substantial part of the events or omissions giving rise to the claims occurred here, including Plaintiff's California-based wire transmissions and interstate communications directed into this District.

3.  Plaintiff is domiciled in Arizona and therefore a citizen of Arizona for § 1332 purposes. The citizenship of Doe Defendants 1–50 is presently unknown; Plaintiff will amend to allege their citizenship when ascertained.

## PARTIES

4.  Plaintiff Lance Turner ("Turner") is a natural person residing in Maricopa County, Arizona, and is an attorney admitted to practice in California.

5.  Defendant Joseph Suarez, a/k/a/ Jose Gilberto Suarezs ("Joe Suarez") resides at 161 Memorial Parkway, Bloomfield, New Jersey 07003, and previously pleaded guilty in the District of New Jersey to conspiring to commit wire fraud in a scheme involving foreign fuel-oil transactions 36 (U.S. v. Suarez, 18 U.S.C. §§ 1349, 2).

6.  Defendant Elizabeth Suarez ("Elizabeth") is Joe Suarez's spouse and resides with him at the Bloomfield address.

7.  Defendant Johnathan Suarez ("Johnathan") is Joe Suarez's adult son, resides at 40 419 SE 2nd St., Apt. 3116, Fort Lauderdale, Florida 33301, and is the nominal owner of Universal Crane Services, LLC ("UCS").

8. Defendant Tiffany Suarez ("Tiffany") is Joe Suarez's adult daughter, resides at 12855 Runway Rd., Apt. 1435, Playa Vista, California 90094, and was formerly engaged in a romantic relationship with Turner.

9. Defendants Does 1–50 include yet-unknown persons and entities, among them Universal Crane Services, Black Crown Oil & Gas, and various trust or escrow agents, who participated in, aided, or concealed the misconduct described herein.

## BACKGROUND OF FACTS

10. Beginning in or about February 2023, Joe Suarez urged Turner to invest in what Suarez described as a lucrative, already-completed transaction for the purchase and resale of Bonny Light crude oil (the "BLCO Investment Venture"). Suarez represented that Turner could "come in late" at no risk, promised a 100 percent return within one month, and portrayed the investment as a means for Turner to buy Tiffany's engagement ring.

11. On or about February 20, 2023, when Turner expressed reservations, Suarez told him to "opt out" only if Turner would grant Suarez two weeks to complete the deal, adding "this will work out nicely."

12. It was further part of the scheme that, on or about February 20, 2023, at Joseph Suarez's instruction, Turner wired $240,000 from Turner's personal Wells Fargo account to a JPMorgan Chase account ending in 0682, registered to Universal Crane Services, LLC ("the UCS Chase Account"), for the ostensible purpose of closing the BLCO Investment Venture.

13. Relying on Suarez's promises, Turner wired the following funds (collectively, the "Investment Funds"), which totaled $357,500:

- $240,000 on or about February 20, 2023;
- $20,000 on June 9, 2023;
- $25,000 on June 16, 2023;
- $5,000 on June 20, 2023;
- $20,000 on November 8, 2023;
- $20,000 on November 22, 2023;
- $10,000 on December 13, 2023.

- $7,500 on May 23, 2024
- $10,000 on June 25, 2024

Each transfer was preceded by urgent pleas from Suarez that the funds were "time sensitive" and would be returned before the December 2023 holidays/the following week.

14. Suarez assured Turner repeatedly that the Investment Funds were secure in a trust for Johnathan and Tiffany and would "never be lost," invoking Suarez's purported "family trust" and Johnathan's company UCS as the payment source.

15. From July 2023 through October 2025, Suarez made no fewer than sixty-five (65) separate oral or written promises that Turner would be repaid "next week," "by Friday," "before Christmas," or on a fixed calendar date. Representative examples include:

- August 8, 2023 ("payment getting released Monday");
- October 10, 2023 (transfer "by Thursday… confident for Thursday");
- December 15, 2023 ("Monday. For sure.");
- February 1, 2024 commitment, reiterated January 24, 2024 ("confirming by February 1");
- July 18, 2024 ("Will get it done tomorrow");
- October 7, 2024 ("keep our fingers crossed for tomorrow");
- January 28, 2025 ("I have every intention in making you whole by the 1st");
- March 14, 2025 ("you will be paid by 3/15");
- June 12, 2025 ("you will have your money in its entirety Wednesday [or] Thursday… promise my man").
- June 23, 2025 ("For payment… should be released by Wednesday.")
- June 26, 2025 ( "Tuesday all should be available.")
- July 10, 2025 ("Will know by 1pm tomorrow… if it's ready to go out to you.")
- July 11, 2025 ("Wednesday morning I will wire you the money.")
- July 15, 2025 ("I will let you know by 1 when it goes out.")
- July 16, 2025 ("we should be ok tomorrow.")
- July 17, 2025 ("will let you know tomorrow what time I expect to send it.")
- July 18, 2025 ( "100% Thursday… certain Thursday is our end date.")

- July 24, 2025 ("100% Tuesday… now we have it right.")
- Aug 1, 2025 ( "later today or first thing on Monday.")
- Aug 7, 2025 ( "hopefully tomorrow.")
- Aug 12, 2025 ("any day now… tomorrow or Thursday.")
- Aug 14, 2025 ("probably tomorrow latest Monday.")
- Aug 22, 2025 ( "official word is Tuesday… for sure Tuesday.")
- Sept 2, 2025 ("meeting Thursday at 1… then I will be able to set out wire.")
- Sept 5, 2025 ("Praying for Monday.")
- Sept 14, 2025 ("this will be done this week.")
- Sept 18, 2025 (continued assurances ("we almost there"))
- October 5, 2025 ("this week or beginning of next week… Lance you are 100% secured.")

None of these dates was honored or materialized.

16. On or about July 7, 2023, after Tiffany ended her relationship with Turner, Suarez telephoned Turner and stated, "Nothing changes, you're like a son to me", reaffirming that Turner's money was safe and would be repaid shortly.

17. Between December 2024 and February 2025, Turner, facing mounting IRS penalties because the promised returns never materialized, sent multiple written demands for repayment. Suarez responded by berating Turner for "adding stress," yet again promised imminent repayment, and pleaded for "a couple more weeks".

18. On February 14, 2025, Suarez claimed "all clearances were issued today" and that $7 million in logistics payments would arrive "at the beginning of this week," but no funds were received.

19. Throughout 2025, Suarez alternated between promising wire transfers "tomorrow," urging Turner not to "hurt my family," and asking Turner to keep acting as escrow attorney for Black Crown transactions, all while admitting he was "cashing in trust stuff I had for the kids" to pay Turner.

20. Johnathan resides at 419 SE 2nd St., Apt. 3116, Fort Lauderdale, FL, and Tiffany resides at 12855 Runway Rd., Apt. 1435, Playa Vista, CA. The sources of funds used to pay their

respective living expenses are presently unknown to Plaintiff; discovery will address whether any Investor funds were used. Neither Johnathan nor Tiffany has held gainful employment during the relevant period; both live in luxury apartments financed, upon information and belief, with Investor funds channeled through UCS and other Suarez-controlled entities.

21. Suarez's prior wire-fraud conviction (2006–2010 fuel-oil scheme) followed an almost identical playbook: recruiting friends-and-family investors with promises of astronomic, near-term returns, routing wires through trust and attorney accounts, and stringing victims along with false assurances when deadlines passed.

22. Suarez concealed from Turner his prior federal wire-fraud conviction and concealed the roles of intermediaries, including any attorneys, shell entities, or trust accounts, previously used to route or hold investor funds. These omissions were material to Turner's decision to entrust funds to Suarez. Suarez concealed from Turner his inability, because of that conviction, to lawfully own or manage certain businesses, and concealed the role of co-conspirator attorneys and shell entities previously used to dissipate investor money. These omissions were material to Turner's decision to entrust Suarez with $357,500.

23. From February 2023 to the present, Defendants have never provided accounting records, escrow statements, vessel charter documents, or trust-distribution paperwork to substantiate the BLCO Investment Venture, despite repeated requests by Turner.

24. As of filing, no portion of the $357,500 principal, let alone the promised 100 percent return, has been repaid. Turner has incurred substantial consequential damages, including tax penalties, interest, lost business opportunities, and emotional distress stemming from Defendants' misconduct.

25. Defendants' scheme was carried out through interstate wire communications (text messages, emails, and wire transfers) originating in California, New Jersey, and Florida, thereby affecting interstate commerce and meeting the pattern-of-racketeering requirements of 18 U.S.C. §1961 et seq.

26. Defendants have refused to return Turner's funds, instead leveraging familial ties and emotional appeals to delay repayment and to induce Turner to continue acting as their

escrow attorney, conduct that constitutes breach of implied-in-fact contract, common-law fraud, conversion/embezzlement, violations of the Unfair Competition Law (Bus. & Prof. Code §17200), intentional infliction of emotional distress, and predicate acts of wire fraud under 18 U.S.C. § 1343.

## FIRST CAUSE OF ACTION

### (Breach of Implied-in-Fact Contract)

27.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 26 hereinabove.

#### Formation of an Implied-in-Fact Contract

A. Between February 2023 and June 2025, Defendants, principally Joseph Suarez, solicited Turner's capital for the BLCO Investment Venture, repeatedly promising that any funds wired would be held in trust and repaid, with profit, within a matter of weeks.

B. Turner accepted the offer by wiring $357,500 in reliance on those promises.

C. The parties' mutual conduct, Turner's funding performance, and Defendants' repeated acknowledgments that the money remained Turner's and would be returned created an implied-in-fact contract obligating Defendants, jointly and severally, to safeguard and promptly repay Turner's principal with the agreed returns. The parties' mutual conduct, promises to repay, performance by funding, and Defendants' repeated acknowledgments that the money remained "yours" and would be returned, created an implied-in-fact contract obligating Defendants jointly and severally to repay the principal plus agreed-upon returns. On or about September 30, 2024, Defendants and each of them breached The Contractor Agreement by terminating The Contractor Agreement without notice, warning or reason. Instead, Defendants, and each of them, created pretextual reasons for terminating The Written Contractor Agreement which were false.

### Performance by Plaintiff

28. Turner fully performed (or was excused from further performance) when he transferred the Investment Funds to accounts designated by Defendants.

### Breach by Defendants

29. Despite no fewer than sixty-five explicit repayment promises between July 2023 and October 2025, Defendants have failed and refused to return any portion of Turner's principal or the promised profit, thereby breaching the implied contract.

### Damages

As a direct and proximate result of Defendants' breach, Turner has suffered:

- Compensatory damages of at least $357,500 (principal);
- Consequential damages including IRS penalties, interest, and lost professional opportunities (amounts to be proven at trial); and
- Pre-judgment interest at the maximum rate permitted by law.

WHERFORE, Plaintiff prays Judgment against Defendants, and each of them, as set forth hereinafter.

## SECOND CAUSE OF ACTION

**Fraud (Intentional Misrepresentation and Concealment)**

30. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 29 hereinabove.

### False Representations and Omissions

A. Defendants, acting in concert, repeatedly represented to Turner that (i) the BLCO Investment Venture was real and already fully executed; (ii) Turner's funds would be maintained in a segregated trust or escrow and "could never be lost"; (iii) Turner would receive a 100 percent return within weeks; and (iv) payment was "imminent" on dozens of specific dates.

B. Defendants concealed (i) that Joe Suarez had a prior federal wire-fraud conviction based on a nearly identical investment scam, (ii) that no completed crude-oil

transaction existed, and (iii) that Investor funds were being used for Defendants' personal living expenses rather than any bona fide business activity.

### Knowledge of Falsity or Reckless Disregard

31. Defendants knew each representation was false, or, at minimum, made the statements with reckless disregard for their truth, because no legitimate transaction or escrow account existed and because Suarez's prior conviction barred him from lawful securities solicitation.

### Intent to Induce Reliance

32. Defendants made the misrepresentations with the intent to induce Turner to part with $357,500, continue providing legal-escrow services, and refrain from pursuing legal remedies while they dissipated the funds.

### Justifiable Reliance

33. Turner reasonably relied on Defendants' assurances, inter alia, because (i) Suarez invoked familial trust; (ii) Suarez provided plausible-sounding oil-industry jargon and purported documents; and (iii) the promised repayment dates were continually updated to appear credible.

### Damages.

34. As a direct and proximate result of Defendants' fraud, Turner has suffered:
   - Out-of-pocket loss of $357,500;
   - Consequential losses, including tax penalties, interest, and business interruption (to be proved at trial);
   - Severe emotional distress; and
   - Attorneys' fees under the tort-of-another doctrine.

### Punitive Damages

35. Defendants' conduct was fraudulent, malicious, and oppressive under Cal. Civ. Code § 3294, entitling Turner to punitive damages in an amount no less than three (3) times compensatory damages, or as otherwise proven at trial.

## THIRD CAUSE OF ACTION

### Civil Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c) & 1962(d))

36. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 35 hereinabove.

### The Enterprise

A. From at least February 2023 to the present, Defendants formed an association-in fact enterprise (the "Suarez Family Enterprise") whose members include the named Defendants, Universal Crane Services ("UCS"), Black Crown Oil & Gas, and various trust or escrow accounts controlled by them.

B. The Enterprise engaged in, and its activities affected, interstate and foreign commerce by soliciting investments, transmitting funds, and issuing wire communications between California, New Jersey, Florida, and overseas banking centers.

### Racketeering Activity

37. Predicate Acts of Wire Fraud (18 U.S.C. § 1343). Between February 2023 and October 2025, Defendants committed no fewer than eighty-three (83) predicate acts of wire fraud, including but not limited to: (i) the specific repayment promises identified in ¶15 (e.g., Aug. 8, 2023; Oct. 10, 2023; Dec. 15, 2023; Jan. 24/Feb. 1, 2024; Jul. 18, 2024; Oct. 7, 2024; Jan. 28, 2025; Mar. 14, 2025; Jun. 12, 2025; September 14, 2025; October 5, 2025); and (ii) directing Turner to wire funds totaling $357,500 across state lines to accounts controlled by the Enterprise.

38. Each transmission employed interstate wire facilities and was for the purpose of executing the overall fraudulent scheme.

### Pattern of Racketeering Activity

39. The predicate acts were related and continuous, sharing the common purpose of obtaining and retaining Turner's money and spanning more than two years, thus constituting a "pattern of racketeering activity" under 18 U.S.C. § 1961(5).

### Conduct of the Enterprise

40. Joseph Suarez directed the Enterprise's affairs; Elizabeth Suarez provided bank accounts and posed as a trustee; Johnathan Suarez supplied UCS as a payment facade; Tiffany Suarez cultivated Turner's trust and relayed assurances; Doe Defendants funneled funds or drafted sham documents. By knowingly participating in these functions, each Defendant "conducted or participated, directly or indirectly," in the Enterprise's affairs through a pattern of racketeering activity, in violation of § 1962(c).

### RICO Conspiracy (§ 1962(d))

41. In the alternative, and in addition, Defendants agreed and conspired to violate § 1962(c). Each committed at least one overt act in furtherance of the conspiracy, namely, the predicate wire-fraud acts described above.

### Injury and Proximate Cause

42. Turner was injured in his business or property by reason of Defendants' RICO violations, suffering (a) the $357,500 principal loss, (b) consequential economic harm (tax penalties, lost income), and (c) costs incurred in attempting to recover the funds.

### Relief Sought Under 18 U.S.C. § 1964(c)

43. Plaintiff is entitled to treble damages, plus reasonable attorneys' fees and costs of suit.

## FOURTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress ("IIED"))

44. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 43 hereinabove.

### Extreme and Outrageous Conduct

A. For more than two years, Defendants strung Turner along with no fewer than sixty-five (65) false promises of imminent repayment, while repeatedly demanding additional "time-sensitive" funds and invoking family ties to silence complaints.

B. Even after Turner explained that the delays were forcing him to take a second job and incur mounting IRS and Franchise Tax Board penalties, Defendants continued the

   charade, chastising him for "threats" and insisting he "wait a bit longer" for the sake of their family.

   C. Suarez weaponized Turner's former romantic relationship with Tiffany, guilt tripping him with statements like, "I entrusted you with my daughter … think about my kids before you do something in haste."

   D. On multiple occasions, Suarez raised his voice, berated Turner for "adding stress," and warned that pursuing legal remedies would "cause problems for anyone." These tactics, leveraging affection, fear, and financial desperation, are so extreme as to exceed all bounds tolerated in a civilized community.

### Intent or Reckless Disregard

45. Defendants either intended to cause Turner severe emotional distress or acted with reckless disregard of the near certainty that such distress would result, continuing their pressure campaign long after Turner's hardships were made explicit.

### Causation

46. Defendants' conduct was the direct and proximate cause of Turner's emotional suffering, including anxiety, sleeplessness, humiliation, and the need to seek additional employment to mitigate mounting tax liabilities.

### Severe Emotional Distress

47. The distress Turner experienced was substantial, enduring, and well beyond that which a reasonable person could be expected to endure under the circumstances, as evidenced by his pleas for relief and repeated references to the "tremendous negative impact" on his life.

### Damages

48. Turner is entitled to (a) general damages for mental anguish and emotional suffering in an amount to be proven at trial; (b) special damages for costs incurred in coping with the distress (medical consultations, therapy, lost income); and (c) punitive damages under Cal. Civ. Code § 3294 because Defendants acted with oppression, fraud, and malice.

# FIFTH CAUSE OF ACTION

**(Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq.))**

49. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 48 hereinabove.

### "Business Acts or Practices"

50. From February 2023 through the present, Defendants solicited and obtained $357,500 from Turner, transmitted dozens of interstate wires, and used Universal Crane Services, Black Crown Oil & Gas, and various trust accounts to perpetuate the scheme, activities that constitute "business acts or practices" within the meaning of the UCL.

### Unlawful Prong (§ 17200)

51. The conduct violates multiple "borrowed" statutes, including:

A. 18 U.S.C. § 1343 (wire fraud) - Defendants sent no fewer than sixty-five (65) fraudulent emails, texts, and wire-instructions promising imminent payment.

B. Cal. Pen. Code § 503 (embezzlement) – Investor funds were diverted to Defendants' personal living expenses instead of any bona-fide oil transaction.

C. Cal. Civ. Code §§ 1572–1573 (fraud) – Misrepresentations of risk-free, one-month 100 % returns; concealment of Joe Suarez's prior wire-fraud conviction.

### Fraudulent Prong (§ 17200)

52. A reasonable consumer would likely be deceived by Defendants' repeated assurances, e.g., "payment getting released Monday," "100% sure … this week," "you will be paid by 3/15."

### Unfair Prong (§ 17200)

53. Defendants' conduct offends established public policy against financial elder-abuse-type schemes, is immoral and unscrupulous, and caused harm (severe tax penalties, loss of income, emotional distress) that outweighs any putative benefits.

### Standing & Injury-in-Fact

54. Turner suffered a loss of money or property: the entire $357,500 principal plus consequential out-of-pocket expenses traceable to Defendants' unfair and fraudulent practices.

Relief Available

55. Under §§ 17203–17204 Plaintiff is entitled to:

- Restitution of the $357,500 (and any additional amounts traceable to Defendants' misconduct);
- Restitutionary disgorgement of ill-gotten gains (limited to amounts traceable to Plaintiff) Disgorgement of ill-gotten gains;
- Permanent injunctive relief prohibiting Defendants from soliciting investments or serving as fiduciaries in California without full judicial accounting and court supervision; and
- Attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5 (private-attorney general doctrine) and any other applicable statute.

## SIXTH CAUSE OF ACTION

**(Conversion (Common-Law) and Embezzlement (Cal. Pen. Code § 503))**

56. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 55 hereinabove.

Plaintiff's Ownership and Right to Possession

57. Between February 20, 2023 and December 13, 2023, Turner wired $357,500 to bank accounts designated by Defendants for the limited purpose of funding the BLCO Investment Venture and to be held for Turner's benefit pending prompt repayment with profit.

Defendants' Wrongful Dominion and Control

A. Instead of safeguarding the funds in an escrow or trust as promised, Defendants diverted money to personal expenditures, including apartment rents and day-to-day living expenses. The precise uses and recipients of Turner's funds will be proven in discovery. Instead of safeguarding the funds in an escrow or trust as promised, Defendants diverted the money to personal expenditures, including luxury apartment rents for Johnathan (Ft. Lauderdale) and Tiffany (Playa Vista) and day-to-day living expenses, despite their lack of employment.

B. Joseph Suarez repeatedly admitted he was "cashing in some trust stuff I had for the kids" in an effort to raise money to repay Turner—an acknowledgment that Turner's investment had already been depleted for Suarez family purposes.

### Refusal to Return Property

58. From July 2023 through October 2025, Suarez issued at least sixty-five (65) specific repayment promises, "payment getting released Monday," "you will have your money in its entirety Wednesday/Thursday," "100 billion percent by October 10," "I got you this week or beginning of next… Lance you are 100% secured." etc., none of which were honored. Defendants have therefore refused to return property that rightfully belongs to Turner.

### Intentional and Substantial Interference

59. Defendants' exercise of dominion over the Investment Funds was intentional, unauthorized, and so substantial that it destroyed Turner's right to immediate possession, constituting conversion and, because the money was obtained under a fiduciary-type representation of safekeeping, statutory embezzlement under Cal. Pen. Code § 503.

### Damages

60. As a direct and proximate result of Defendants' conversion/embezzlement, Turner has suffered:

- Compensatory damages of $357,500 (principal);
- Consequential damages for tax penalties, interest, and lost opportunities; and
- Pre-judgment interest from each date of misappropriation.

### Punitive Damages

61. Defendants' conduct was willful, fraudulent, and oppressive, warranting punitive damages under Cal. Civ. Code § 3294 in an amount to be determined at trial.

### Equitable Relief – Constructive Trust

62. Plaintiff further seeks imposition of a constructive trust over all assets, accounts, and real or personal property traceable to the misappropriated funds, including but not limited to rents, vehicles, and any proceeds held by Universal Crane Services, Black Crown Oil & Gas, or family trusts.

## SEVENTH CAUSE OF ACTION

## (Constructive Trust and Accounting)

63.  Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 62 hereinabove.

### Existence of Identifiable Property

64.  The $357,500 Turner wired to Defendants, together with any gains, proceeds, or property acquired therewith, remains identifiable in whole or in part in Defendants' bank accounts, trust accounts, rental-property payments, vehicles, and other assets held by or for the benefit of the Suarez Family Enterprise.

### Rightful Ownership and Equitable Title

65.  Turner retains equitable title to the Investment Funds because (a) they were entrusted for a limited, specific purpose; (b) Defendants agreed they would remain Turner's money until repaid; and (c) Defendants never provided any consideration or completed performance that would divest Turner of ownership.

### Unjust Enrichment

66.  By misappropriating the funds for personal expenses and refusing to return them despite more than sixty-five explicit repayment promises, Defendants have been unjustly enriched at Turner's expense.

### Inadequacy of Legal Remedy

67.  Money damages alone are an insufficient remedy because:

  A. Defendants have shown a pattern of dissipating assets and concealing their whereabouts; and

  B. Without equitable tracing and a constructive trust, Turner risks being an unsecured creditor in the event of bankruptcy or further transfers to third parties.

### Constructive Trust

68.  Equity therefore requires that all property, real, personal, tangible, or intangible, traceable to Turner's Investment Funds be impressed with a constructive trust for his benefit, with Defendants deemed involuntary trustees holding such property for Turner.

Complaint for Damages

-16-

Accounting

69. Defendants are in exclusive possession of the records needed to trace Turner's funds. An order directing a full forensic accounting of all accounts, trusts, and entities through which the funds flowed is necessary to identify and marshal trust assets.

## EIGHTH CAUSE OF ACTION

### (Common Counts – Money Had and Received / Unjust Enrichment)

70. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 69 hereinabove.

Money Had and Received

A. Between February 20, 2023 and December 13, 2023, Defendants received from Turner a total of $357,500 to be used strictly for the BLCO Investment Venture and promptly returned with profit.

B. Defendants have retained the funds and all associated gains, despite Turner's repeated demands for repayment.

C. In equity and good conscience, Defendants ought to repay Turner the full amount, together with any profits realized thereon.

Unjust Enrichment

A. Defendants benefited by using the Investment Funds to pay personal living expenses, luxury apartment rents, and other non-investment expenditures.

B. Defendants' retention of those benefits is unjust because the funds were obtained through fraud, false promises, and breaches of fiduciary-type duties.

Damages / Restitution

71. Plaintiff is entitled to restitution of $357,500, plus disgorgement of any profits or gains traceable to the funds, pre-judgment interest, and consequential losses (tax penalties, interest, lost income) to be proven at trial.

WHEREFORE, Plaintiff Lance Turner respectfully prays for judgment in his favor and against Defendants Joseph Suarez, Elizabeth Suarez, Johnathan Suarez, Tiffany Suarez, and Does 1–50, jointly and severally, as follows:

1. Compensatory Damages: Awarding no less than $357,500 (the principal investment), plus consequential damages, including tax penalties, interest, lost professional opportunities, and any other pecuniary losses, according to proof;

2. Treble (RICO) Damages: Trebling the compensatory damages pursuant to 18 U.S.C. § 1964(c);

3. Restitution (UCL): Ordering restitution and disgorgement of monies or property traceable to Plaintiff's funds as authorized by Cal. Bus. & Prof. Code § 17203, and as further supported by the common-count claims. Restitution & Disgorgement: Ordering full restitution and disgorgement of all monies, profits, and property obtained by Defendants through their unlawful, unfair, and fraudulent conduct, as authorized by Cal. Bus. & Prof. Code § 17203 and the common-count claims;

4. Punitive/Exemplary Damages: Awarding punitive damages under Cal. Civ. Code § 3294 in an amount no less than three (3) times the total compensatory damages, or such other sum sufficient to punish and deter similar misconduct;

5. Equitable Relief:
   a. Imposing a constructive trust over all assets, accounts, and property, real or personal, traceable to Plaintiff's funds;
   b. Ordering a full accounting of all such assets; and
   c. Appointing a receiver or special master (as necessary) to marshal, trace, and preserve the trust res;

6. Injunctive Relief: Permanently enjoining Defendants, and all persons acting in concert with them, from soliciting investments, holding fiduciary funds, or conducting any business in California involving investor capital until full restitution is made and the Court is satisfied that adequate safeguards are in place;

Complaint for Damages

7. Attorneys' Fees: Awarding reasonable attorneys' fees and litigation costs under 18 U.S.C. § 1964(c), Cal. Code Civ. Proc. § 1021.5, the tort-of-another doctrine, and any other applicable statute or equitable principle;

8. Pre- and Post-Judgment Interest: At the maximum rate permitted by law, from the earliest date of loss until the date judgment is satisfied;

9. Costs of Suit: Awarding all taxable and non-taxable costs incurred herein; and;

10. Further Relief: Granting such other and further legal or equitable relief as the 450 Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: November 10, 2025                    THE PORRAZZO LAW FIRM

                                            _____
                                            MICHAEL H. PORRAZZO
                                            Attorney for Plaintiff
                                            Lance Turner